PRESENT:  All the Justices

RALPH JOHNSON, TRUSTEE FOR
WAKEFIELD MANOR ASSOCIATES, ET AL.

|                        | OPINION BY                        |
|------------------------|-----------------------------------|
| v.  Record No. 160246  | JUSTICE STEPHEN R. McCULLOUGH     |
|                        | December 22, 2016                 |

ARLINGTON COUNTY


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

Wakefield Manor and Courthouse Manor, two Arlington County taxpayers, challenge the

County's inclusion of "transferrable development rights," or TDRs, in their real estate

assessment.  They argue that the County had no authority to assess and tax TDRs on their

properties for the years 2012 through 2015.  We agree with the taxpayers and reverse the

judgment of the circuit court.

BACKGROUND

TDRs have emerged as a land use development tool in urban areas.  TDRs can help a

locality to "protect[] the environment and preserv[e] open spaces."  Amanda Siek, Comment,

*Smart Cities:  A Detailed Look at Land Use Planning Techniques that are Aimed at Promoting*

*Both Energy and Environmental Conservation*, 7 Albany Envt'l Outlook J. 45, 62 (2002).  TDRs

provide a tool for a locality to direct "new growth away from environmentally sensitive areas,

historic, agricultural, or open space areas."  *Id.*  Under "a TDR program, areas to be protected

from further development, 'sending areas,' and areas better suited for increased development,

'receiving areas,' are identified."  *Id.*  The locality can channel new development "into the

receiving zones using development credits that are purchased from landowners in the sending

zones, thereby compensating them for the development value of their land."  *Id.*  Once a

regulatory framework is in place, a property owner with unused density can sever, sell, and

transfer unused density to a designated receiving property, which can then build a more profitable project with the aid of the TDRs.

In 2005, the General Assembly enacted Code § 15.2-750, which permits the Board of Supervisors in a county with a county manager form of government to provide

> for the dedication of density or other rights to develop real property, as defined by the locality, from one or more parcels of property that are not the subject of a development application and are located in the locality to one or more parcels of property that are the subject of a development application and are located elsewhere in the locality. Such dedication shall be subject to such terms as may be provided by zoning regulations, the conditions of a special use permit or special exception, or the proffered conditions of a rezoning application, including that the terms are binding on the owners of such property and on their successors and assigns.

2005 Acts ch. 755. In response, Arlington County enacted a zoning ordinance amendment establishing a TDR program. That ordinance, currently found in Section 15.5.7(B) of the County's zoning ordinances, provides in relevant part:

> In approving and accepting a site plan, the County Board may, subject to such conditions as the [County] Board may approve, permit the dedication of density or other rights to develop, as determined by the [County] Board, from one or more parcels that are not the subject of a particular site plan application to one or more parcels of property that are the subject of that same site plan application.

Under the County's ordinance, TDRs cannot be transferred without the County's approval of a site plan. Arlington County's Policy Guidance for the TDR program explains that "TDRs could occur only through a site plan process on the 'receiving' site. [The] County Board must approve all sending and 'receiving' sites."

2

One year later, the General Assembly enacted a more comprehensive statutory scheme governing TDRs, Code §§ 15.2-2316.1 through -2316.2. The latter statute specifies that "[i]n order to implement the provisions of this act, a locality shall adopt an ordinance that shall provide for" a list of twelve specifically enumerated provisions. Code § 15.2-2316.2(B). Those twelve provisions are:

> 1. The issuance and recordation of the instruments necessary to sever development rights from the sending property, to convey development rights to one or more parties, or to affix development rights to one or more receiving properties. These instruments shall be executed by the property owners of the development rights being transferred, and any lien holders of such property owners. The instruments shall identify the development rights being severed, and the sending properties or the receiving properties, as applicable;
>
> 2. Assurance that the prohibitions against the use and development of the sending property shall bind the landowner and every successor in interest to the landowner;
>
> 3. The severance of transferable development rights from the sending property;
>
> 4. The purchase, sale, exchange, or other conveyance of transferable development rights, after severance, and prior to the rights being affixed to a receiving property;
>
> 5. A system for monitoring the severance, ownership, assignment, and transfer of transferable development rights;
>
> 6. A map or other description of areas designated as sending and receiving areas for the transfer of development rights between properties;
>
> 7. The identification of parcels, if any, within a receiving area that are inappropriate as receiving properties;
>
> 8. The permitted uses and the maximum increases in density in the receiving area;
>
> 9. The minimum acreage of a sending property and the minimum reduction in density of the sending property that may be conveyed in severance or transfer of development rights;

10. The development rights permitted to be attached in the receiving areas shall be equal to or greater than the development rights permitted to be severed from the sending areas;

11. An assessment of the infrastructure in the receiving area that identifies the ability of the area to accept increases in density and its plans to provide necessary utility services within any designated receiving area; and

12. The application to be deemed approved upon the determination of compliance with the ordinance by the agent of the planning commission, or other agent designated by the locality.

*Id.* Code § 15.2-2316.2(C) also provides that a county "may" enact an ordinance with additional provisions beyond those required by Code § 15.2-2316.2(B).

Ralph Johnson is the Trustee for Wakefield Manor. Wakefield Manor owns "garden apartments" in Arlington County located at 1201 and 1215 Courthouse Road, and 2025 Fairfax Drive in Arlington. Courthouse Manor Associates owns garden apartments located at 1233 North Courthouse Road, in Arlington County. Originally constructed to provide affordable housing in a verdant setting, such garden apartments can now be considered desirable for their convenient location, verdant setting, and sense of community. Many of these apartment complexes are now on the National Register of Historic Places or the Virginia Landmarks Register.

In 2011, the taxpayers asked the County Board to approve the redevelopment of their property, which included the construction of a 12-story, 104-unit apartment building and the historic preservation of garden apartment buildings on the site. In exchange for the historic preservation of the garden apartment buildings, taxpayers asked the County to certify 104,789 square feet of residential gross floor area as TDRs. This number represents the density that the taxpayers would be entitled to had they not elected to preserve existing buildings.

4

On October 15, 2011, the Arlington County Board approved a site plan designed to preserve the existing garden apartments. As part of this site plan, the Board adopted a resolution certifying Transferrable Development Rights for the taxpayers. The taxpayers would receive TDRs amounting to 104,789 square feet in exchange for the forfeited unused density that is the result of the historic preservation of the garden apartments the taxpayers own. These TDRs were approved without a receiving site.

Beginning in 2012, following the approval of the TDRs for the taxpayers – but prior to the County's approval of a receiving site – the County assessed the taxpayers' property at a higher rate based on the TDRs – an increase in the assessment of slightly more than 360 percent. The County initially valued the TDRs at $70,000 for each unit, or approximately $70 per square foot. Following administrative appeals, this assessment was reduced to $60 per square foot and later to $40 per square foot.

Meanwhile, on November 20, 2013, the taxpayers reached an agreement with Carr Properties giving Carr Properties the option to purchase between 84,417 and 104,789 square feet of gross floor area in the form of transferable development rights. The agreement was contingent on the County's approval of a site plan and receiving site that could receive the TDRs. On March 14, 2015, Arlington County approved a site plan and a transfer of development rights resolution that permitted the transfer of 104,789 square feet of TDRs to be transferred from the taxpayers to a Carr Properties project. The taxpayers also agreed to a historic easement that limited development on their properties as of January 2016.

The taxpayers unsuccessfully challenged their assessments for the years 2012 and 2013. For its part, the County filed a counterclaim seeking to increase the assessment on the properties

for the years 2014 and 2015. After administrative appeals were exhausted, the case found its

way to circuit court. The court ruled in favor of the County, and this appeal followed.

ANALYSIS

We review de novo a trial court's interpretation of statutes and municipal ordinances.

*CVAS 2, LLC v. City of Fredericksburg*, 289 Va. 100, 108, 766 S.E.2d 912, 914 (2015).

I.      THE COUNTY MAY NOT TAX TDRs UNDER CODE § 15.2-2316.2 UNLESS IT ENACTS AN ORDINANCE THAT CONFORMS TO THE DETAILED REQUIREMENTS OF THAT STATUTE.

Code § 15.2-2316.2 permits a locality to tax TDRs from a "sending" site before they are

attached to a "receiving" site. The County relies on section (I) of Code § 15.2-2316.2. That

statute provides in relevant part:

> For the purposes of ad valorem real property taxation, the value of a transferable development right shall be deemed appurtenant to the sending property until the transferable development right is severed from and recorded as a distinct interest in real property, or the transferable development right is used at a receiving property and becomes appurtenant thereto.

The taxpayers argue that Code § 15.2-2316.2 does not permit Arlington County to tax the

TDRs. They point to Code § 15.2-2316.2(B), which specifies that "[i]n order to implement the

provisions of this act, a locality shall adopt an ordinance that shall provide for" twelve specific

clauses.

We agree with the taxpayers that Code § 15.2-2316.2 does not authorize the County to

tax TDRs unless it enacts an ordinance in conformity with the Act. The fact that the Code

specifies that a locality "shall" adopt a particular ordinance to implement the act is not

necessarily dispositive. Whether the word "shall" is permissive or mandatory depends on

"subject matter and context." *Pettus v. Hendricks*, 113 Va. 326, 330, 74 S.E. 191, 193 (1912).

This particular statute plainly contemplates that a County must enact an ordinance in accord with

6

Code § 15.2-2316.2(B) as a necessary precondition for the taxation of TDRs under Code § 15.2-2316.2(I).

Code § 15.2-2316.2 establishes a scheme with interlocking and mutually dependent provisions designed to establish a marketplace for TDRs. Code § 15.2-2316.2 is not a "cafeteria style" statute that would enable the County to select which clauses it wishes to adopt and which provisions it wishes to sidestep. To the extent there is any doubt, a well-established canon of statutory construction provides that "[t]ax laws are to be liberally construed in favor of the taxpayer and are not to be extended by implication beyond the clear import of the language used." *City of Richmond v. Valentine*, 203 Va. 642, 646, 125 S.E.2d 854, 858 (1962). "No one can be held to the payment of a tax unless he comes clearly within the terms of the particular act or ordinance." *Id.* If a County wishes to tax TDRs under Code § 15.2-2316.2(I), it must first enact an ordinance in conformity with the requirements imposed by Code § 15.2-2316.2(B).

Arlington County did not establish an ordinance as required by Code § 15.2-2316.2(B). Consequently, it may not rely on Code § 15.2-2316.2(I) to tax the TDRs at issue.

II.  ARLINGTON LACKS THE AUTHORITY TO TAX TDRS UNDER CODE § 15.2-750 AND ITS ORDINANCE UNTIL IT HAS APPROVED AND ACCEPTED A SITE PLAN.

The taxpayers next contend that Code § 15.2-750 also does not permit Arlington County to tax its TDRs. They note that both Code § 15.2-750 and the County's ordinance contemplate approval of both a "sending" and a "receiving" site for the TDRs. They also argue that Code § 15.2-2316.2 provides the exclusive means of taxing TDRs.

In response, the County correctly points out that no special authorization is needed for a locality to tax a real estate interest. Existing statutes broadly provide that "[a]ll real estate, except that exempted by law, shall be subject to annual taxation as may be prescribed by law."

7

Code § 58.1-3201. Real estate is defined as "lands, tenements and hereditaments, and all rights and appurtenances thereto and interests therein, other than a chattel interest." Code § 1-219.

We disagree with the taxpayers that Code § 15.2-2316.2 provides the exclusive authorization for the taxation of TDRs. Once a TDR becomes an interest or a right in real estate, it may be taxed. The question remains, however, as to when TDRs become taxable under Code § 15.2-750.

Code § 15.2-750 allows a County with a county manager form of government to enact an ordinance that provides

> for the dedication of density or other rights to develop real property, as defined by the locality, from one or more parcels of property that are not the subject of a development application and are located in the locality to one or more parcels of property that are the subject of a development application and are located elsewhere in the locality. Such dedication shall be subject to such terms as may be provided by zoning regulations, the conditions of a special use permit or special exception, or the proffered conditions of a rezoning application, including that the terms are binding on the owners of such property and on their successors and assigns.

Arlington County's municipal zoning ordinance provides in relevant part,

> In approving and accepting a site plan, the County Board may, subject to such conditions as the [County] Board may approve, permit the dedication of density or other rights to develop, as determined by the [County] Board, from one or more parcels that are not the subject of a particular site plan application to one or more parcels of property that are the subject of that same site plan application.

Virginia follows the Dillon Rule. Under this principle, local governing bodies "have only those powers that are expressly granted, those necessarily or fairly implied from expressly granted powers, and those that are essential and indispensable." *Marble Techs., Inc.*, 279 Va. 409, 417, 690 S.E.2d 84, 88 (2010) (quoting *Board of Zoning Appeals v. Board of Supervisors*,

8

276 Va. 550, 553-54, 666 S.E.2d 315, 317 (2008) (internal quotation marks omitted)). "If there is a reasonable doubt whether legislative power exists, the doubt must be resolved against the local governing body." *Board of Supervisors v. Reed's Landing Corp.*, 250 Va. 397, 400, 463 S.E.2d 668, 670 (1995).

"For a tax to be valid, it must be supported by express legislative authority." *City of Richmond v. SunTrust Bank*, 283 Va. 439, 442, 722 S.E.2d 268, 270 (2012) ("[A locality] can derive its taxing power only through positive grants of authority from the General Assembly."). TDRs are entirely creatures of statute and they are governed by a specific statutory regime. Our review of the text of Code § 15.2-750 and Arlington County's ordinance, fortified by the restrictive Dillon Rule canon of construction, leads us to conclude that two things must occur for TDRs to come into being. First, the County must approve an application from an eligible sending site (in the language of the County ordinance "from one or more parcels of property that are not the subject of a particular site plan application"), and, second, the County must approve a receiving site ("to one or more parcels of property that are the subject of that same site plan application"). The "dedication of density or other rights," i.e., the creation of TDRs, occurs under Code § 15.2-750 and the County's ordinance when *both* conditions have been fulfilled. The TDRs have *potential* value before that, but until the County approves a sending site and a receiving site, in the eyes of the law, the TDRs remain an inchoate interest or right. Once the TDRs are created by the County's approval of a sending and a receiving site, they become a right or interest in real estate under the broad definition found in Code § 1-219 and they may be taxed under Code § 58.1-3201.

Applying these principles to the TDRs at issue, the first pre-condition, the approval of a sending site, occurred on October 15, 2011, and the second condition, the approval of a receiving

9

site, occurred on March 14, 2015.[*] Accordingly, March 14, 2015 is the date when the TDRs became a right or interest, and the date when the County could begin assessing the TDRs for purposes of taxation.

CONCLUSION

We will reverse the judgment of the circuit court and remand the case to the circuit court for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[*] Our resolution obviates the need for us to address the taxpayers' third assignment of error, which raises the question of whether the TDRs "were too speculative to be taxable real estate interests prior to the County's approval of a 'receiving' site for the TDRs."